USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 21, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                  :

CROSS COMMERCE MEDIA, INC.,         :
                                  :

                 Plaintiff/Counterclaim   :
                 Defendant,               :
           -v-                             :        13-cv-2754 (KBF)
                                  :
                                  :        <u>OPINION & ORDER</u>

COLLECTIVE, INC.,                     :
                                  :
                 Defendant/Counterclaim :
                 Plaintiff.                 :
                                  :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

       Trademarks are used to distinguish one person's goods from those of another. 15 U.S.C. § 1127.  Trademark protection serves two complementary purposes: protecting consumers from deception and confusion with regard to marks used in trade, and protecting the investment a party has made in its development and use of a mark.  1 <u>McCarthy on Trademarks</u> § 2:2 (4th ed. 2014).

       In the instant case, the parties have expended significant time and resources disputing whether one may prevent the other from using the word "collective." "Collective," however, is a commonly used word employed in commerce and company names across this country.  For this reason, at the initial conference in this case, the Court questioned whether this word, standing alone, could be a protectable mark as a matter of law.  Now, shortly before the trial of this matter was scheduled to commence, plaintiff has moved for summary judgment on that very issue.

Plaintiff argues that it has not infringed on defendant's trademark since the word "collective" is not a protectable mark.  For the reasons set forth below, this Court agrees.  Plaintiff alternatively argues that even if the word was protectable, plaintiff is the senior user.  Again, this Court agrees.  Accordingly, this Court GRANTS plaintiff's motion for summary judgment.

In connection with resolving plaintiff's motion for summary judgment, the Court also GRANTS plaintiff's motions to preclude two of defendant's experts, Michael Rappeport and Thomas T. Berger, and DENIES plaintiff's July 11, 2014 motion in limine as moot

## I.     PROCEDURAL BACKGROUND

On April 25, 2013, plaintiff Cross Commerce Media, Inc. ("Cross Commerce") filed the instant declaratory judgment action against defendant Collective, Inc. ("CI").  (ECF No. 1.)  Cross Commerce seeks declarations of invalidity, non-infringement and waiver or estoppel, as well as cancellation or modification of CI's marks.  On May 16, 2013, CI answered and asserted three counterclaims: infringement of a registered mark, infringement of an unregistered mark, and unfair competition under New York law.  (ECF No. 5.)  In the months that followed, both parties appeared to seriously consider settling this case, and a magistrate judge in this district assisted them with settlement discussions.  (See ECF No. 19.)  Ultimately, however, they were unable to resolve their dispute.

Following this breakdown in negotiations, in mid-December of 2013, Cross Commerce moved for partial summary judgment on the issue of whether the mark

"collective" was descriptive.  (ECF Nos. 31-34.)  That motion became fully briefed in mid-February 2014, and was then resolved in Cross Commerce's favor by an Opinion & Order dated March 24, 2014.  (ECF No. 55 ("March 24, 2014 Opinion").)

The Court's resolution of the motion was based in large part on the fact that CI failed to present or proffer any evidence at all that its mark was more than merely descriptive.  (See id. at 11.)  For instance, CI could have submitted documents showing an arguably suggestive use; it could have submitted a declaration from an individual within the company describing why or how the mark was suggestive; it could have offered historical documents from its own marketing efforts supporting suggestive use.  Instead of any of this, CI merely presented rhetoric that the motion was premature because CI needed additional time for discovery and possibly an expert to perform survey research.  (See Declaration of Eric Andalman, ECF No. 41 ¶¶ 7-9 ("Andalman Decl.").)  CI's papers disregarded the requirement of specificity—even after a conference with the Court in which the Court explicitly raised the issue and made numerous suggestions as to the types of documents CI could submit if they existed.  Finally, in the absence of any evidence submitted in support of CI's opposition to summary judgment, the Court granted Cross Commerce's motion for partial summary judgment and denied CI's Rule 56(d) motion.  (March 24, 2014 Opinion at 11.)  Notably, as it turns out, CI never undertook a consumer survey.

On April 2, 2014, CI moved for reconsideration of the Court's March 24 Opinion & Order.  (ECF No. 57.)  The Court denied the motion, reiterating that CI

had failed to present any evidence that its use of the word "collective" was anything other than descriptive, thereby failing to create a triable issue of fact.  (ECF No. 74.)

## II.    FACTUAL BACKGROUND[1]

The facts necessary for the resolution of this motion are not in dispute.  The parties, however, draw starkly different conclusions from these facts.

CI was founded in 2005 as "Collective Media."  (RSOF ¶ 2.)  CI is now and has always been a company that assists other companies in developing "digital audience solutions for brand advertisers."  (RSOF ¶ 3.)  In January 2008, CI applied to register the mark "Collective Media" on the Principal Register.[2]  (RSOF ¶ 4.)  In its application, CI represented that it had begun using the mark "Collective Media" in commerce in January 2005. (RSOF ¶4.)  CI also began using the Internet domain name "collective.com" in November 2008.  (RSOF ¶ 2.)  In a declaration submitted in support of its trademark application, CI's Vice President of Marketing, Veronica Mathieson, stated that the "COLLECTIVE MEDIA mark is used by Collective Media in connection with an ad network that connects websites (also known as publishers) that want to host advertisements with advertisers who want to run

---

[1] The following facts are taken from plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 (ECF No. 104 ("SOF")) and defendant's response to that statement (ECF No. 132 ("RSOF")).  Defendant's response to plaintiff's statement fails to directly address a number of straightforward facts, and these failures are considered admissions as a matter of law.  See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003).

[2] The Principal Register is the United States Patent and Trademark Office's primary registry of trademarks.  It is governed by Subchapter I of the Lanham Act, 15 U.S.C. § 1051 et seq. "Registration of a mark on the federal Principal Register confers a number of procedural and substantive legal advantages over reliance on common law rights."  McCarthy on Trademarks and Unfair Competition, supra, § 19:9.

advertisements."  (Declaration of Timothy P. Heaton, ECF No. 105 ex. D ¶ 3 ("Heaton Decl.").)

CI abandoned its attempt to trademark "Collective Media" after the United States Patent and Trademark Office ("PTO") concluded that the proposed mark conflicted with an existing mark, "Media Collective."  (See RSOF ¶ 4.)  Instead, in November 2008, CI registered the mark "COLLECTIVE NETWORK," for "an Internet-based advertising network."  (Heaton Decl. ex. G.)

In 2009, CI hired the marketing firm Makovsky & Company to assist with rebranding.  (SOF ¶ 5; see Heaton Decl. ex. E at 117.)  CI then created a new brand position around "C Collective The Audience Engine," while continuing to operate under the corporate name "Collective Media, Inc."  (SOF ¶¶ 5-6.)[3]  CI then began using the mark "C Collective The Audience Engine" (SOF ¶ 13), which took the following visual form:



(Declaration of Britta Hoskins, ECF No. 135 ex. E ("Hoskins Decl.")).  The stylized "C" figures prominently.

Since this rebranding, CI has displayed the "C Collective The Audience Engine" mark prominently on its website and in its advertising.  (See SOF ¶¶ 5-6;

---

[3] The Court rejects CI's denial that it created a new brand position around "C Collective The Audience Engine" as deficient because it is nothing more than a blanket denial that is not supported by "citation to evidence which would be admissible."  Local Civil Rule 56.1(d); see Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004).

Hoskins Decl. ex. E.)  For instance, in a 2012 PowerPoint presentation, CI prominently displays the "C Collective The Audience Engine" trademark on the cover page and uses it as a header on each internal page.  (Heaton Decl. ex. R (Jan. 23, 2012)).  Other company documents dating from 2011 to 2014 similarly display the "C Collective The Audience Engine" trademark prominently.  (See, e.g., id. exs. S-Y (dates ranging from Feb. 18, 2011 to Mar. 12, 2014); see also Affidavit of Justin N. Kattan, ECF No. 134 exs. G-I, M, N, U, GG ("Kattan Aff.") (dates ranging from Oct. 2010 to Sept. 19, 2012); Hoskins Decl. ex. D (dates ranging from Mar. 29, 2011 to Sept. 30, 2011).)  CI's website also uses the "C Collective The Audience Engine" trademark in a slightly different visual form (see Heaton Decl. ex. AA), and on the marketing survey relied upon by CI's expert Michael Rappeport, the stylized "C" from the trademark is featured on the bottom of each page (see Heaton Decl. ex. BB).

In none of the documents submitted by either party in support of or in opposition to this motion is the word "collective" alone featured prominently in the nature of a trademark.  In certain instances, the stylized "C" appears next to the word "Collective."  (See Kattan Aff. exs. Q (referring to CI's attendance at an event), S (referring to CI giving out complimentary ice cream at a conference, dated June 2011), Z (referring to CI); Hoskins Decl. exs. K (Facebook page bearing print date May 16, 2014), L (Twitter profile bearing print date May 16, 2014).)

There are documents in which CI as a company is referred to within the text (for example, in news articles or marketing materials) by the shorthand,

"Collective," but in those same materials, the "C Collective The Audience Engine" trademark is featured prominently.  (<u>See, e.g.</u>, Kattan Aff. exs. G (using trademark prominently on page and referring to the company name by the shorthand, "Collective"), H (same), I (same), L (referring to the company by the shorthand "Collective"), K (same); Hoskins Decl. exs. D (each page bears the trademark "C Collective The Audience Engine"), E (same).)[4]

CI never trademarked the standalone word "collective," and there is no evidence that it ever tried to.  Its chief executive officer, Joe Apprendi, testified at his deposition that if CI had not attempted to trademark "collective" it was because CI had been advised that it could not obtain a mark for that word alone.  (RSOF ¶ 16; Heaton Decl. ex. E at 120.)  In fact, the only trademarks CI has successfully registered are:

1.  "Collective Network" (No. 3538489), registered in 2008;

2.  "Collective Video" (No. 3671913), registered in 2009;

3.  "C Collective The Audience Engine" (No. 3929580), registered in 2011 with the stylized "C".

(RSOF ¶ 7.)

Indeed, a search of the PTO's Trademark Electronic Search System for the word "collective" returns 534 results (as of November 2013), and in 186 instances the PTO required disclaimer of the use of the word "collective" as being descriptive or rejected the application on the same basis.  (RSOF ¶ 18.)  The word "collective" is

---

[4] In a 2009 email, the stylized "C" appears next to the trademark "Collective Media." (<u>See</u> Hoskins Decl. ex. H.)

also used in the name of over 7,000 businesses registered in 45 states (as of December 2013).  (SOF ¶ 18.)

Cross Commerce incorporated in Delaware in November 2007.  (SOF ¶ 19.) Cross Commerce has developed business intelligence applications for "big data" software.  (SOF ¶ 20.)  In November 2010, Cross Commerce filed an Intent to Use application with the PTO for the mark "COLLECTIVE INTELLIGENCE."  (SOF ¶ 21.)  The registration identifies the mark as pertaining to software "as a service for deploying and analyzing marketing campaigns."  (SOF ¶ 22.)  Cross Commerce began using that mark in commerce in 2011 in connection with its business intelligence products.  (SOF ¶ 21.)  On April 4, 2011, Cross Commerce filed an amendment with the PTO indicating a first use date of January 18, 2011.  (SOF ¶ 21.)

In September 2011, Cross Commerce decided to shorten its name and the name for its products to "Collective[i]."  (SOF ¶ 21.)  Cross Commerce filed for the stylized "COLLECTIVE[i]" mark in March 2011, and it obtained the rights for the domain name "collectivei.com" in December 2010.  (SOF ¶ 23.)

Starting in January 2012, Cross Commerce and CI engaged in a series of discussions regarding their respective uses of the word "collective."  In March 2012, CI filed for a formal name change with the Delaware Division of Corporation, and changed its name from "Collective Media, Inc." to "Collective, Inc."  (SOF ¶ 28.)

III.    LEGAL STANDARDS

    A.    <u>Summary Judgment</u>

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. <u>Price v. Cushman & Wakefield, Inc.</u>, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); <u>see also</u> <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); <u>see also</u> <u>Price</u>, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory

9

statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—that is, "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to defeat summary judgment motion).

B.   Expert Testimony

"[E]xpert testimony may help a jury understand unfamiliar terms and concepts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991). A trial court has an obligation, however, to act as a gatekeeper with respect to expert testimony. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008). This is due in large part to the fact that an expert is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 592.

The "primary locus" of the trial court's gatekeeping obligation is Federal Rule of Evidence 702, "which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Id. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Accordingly, this Court's inquiry into whether an expert meets Rule 702's requirements includes a review of (1) the proposed expert's qualifications; (2) the reliability of the data and methodology underlying each proposed opinion; and (3) the helpfulness of the proposed testimony to the trier of fact. See, e.g., Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005); Arista Records LLC v. Lime Grp. LLC, No. 06-cv-5936 (KMW), 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011). Thus, the "overarching subject" of the Rule 702 inquiry is "the evidentiary relevance and reliability" of "the principles that underlie a proposed submission," and not "the conclusions they generate." Daubert, 509 U.S. at 594-95.

However, if an expert's opinions are merely conclusory, they are not entitled to any deference, no matter what the expert's qualifications may be. See Major League Baseball, 542 F.3d at 311. Conclusory opinions are a form of "ipse dixit,"

and often provide an insufficient basis upon which to assess reliability.  See, e.g.,

Nimely, 414 F.3d at 396.

        1.    Reliability

The reliability of a proposed expert's testimony "entails a preliminary

assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be

applied to the facts in issue."  Daubert, 509 U.S. at 592–93.  Among the questions to

be answered are whether the theory or methodology is testable, whether it has been

subjected to peer review, its potential rate of error, and whether it has "general

acceptance" within the relevant community.  Id. at 593–94.

However, there are limitations that a court can, and indeed sometimes must,

place upon even a well-qualified expert who proposes to testify as to some

admissible opinion.  For instance, the court may preclude an expert from testifying

on the credibility of other witnesses or evidence.  See, e.g., United States v. Scop,

846 F.2d 135, 142 (2d Cir.), modified on reh'g, 856 F.2d 5 (2d Cir. 1988).

Furthermore, an opinion that is speculative or conjectural does not satisfy

Rule 702.  See Daubert, 509 U.S. at 590 ("[T]he word 'knowledge' connotes more

than subjective belief or unsupported speculation.").  Thus, proffered "expert

testimony should be excluded if it is speculative or conjectural."  Boucher v. U.S.

Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).  While the Daubert inquiry is

"flexible" and intended to give the Court the "discretion needed to ensure that the

courtroom door remains closed to junk science," it is also true that, to merit

admissibility, "it is critical that an expert's analysis be reliable at every step."

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

        2.      Motions directed at experts

In deciding a motion for summary judgment, a court may only consider

admissible evidence.  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  When a

party offers expert declarations in support of its position, and a motion has been

made to exclude such expert declarations, a court must first decide the motion to

exclude, in order to determine whether such testimony may be considered in

connection with the motion for summary judgment.  See id.  "This is true even if the

exclusion of expert testimony would be outcome-determinative."  Berk v. St.

Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005).

        C.      Relevant Principles of Trademark Law

The term "trademark" or "mark" refers to "any word, name, symbol, or device,

or any combination thereof," used by a person to identify his goods and distinguish

them from those manufactured or sold by others.  15 U.S.C. § 1127.

Section 43(a) of the Lanham Act prohibits any person from using

> in connection with any goods . . . any word, symbol, or
> device, or any combination thereof . . . which . . . is likely
> to cause confusion, or to cause mistake, or to deceive . . .
> as to the origin, sponsorship, or approval of his or her
> goods . . . by another person.

Id. § 1125(a).  Thus, the central inquiry in an infringement case is whether the use

of a mark is likely to cause consumer confusion.  Bristol-Myers Squibb Co. v.

McNeil-P.C., Inc., 973 F.2d 1033, 1038 (2d Cir. 1992).

1.    <u>Unregistered trademarks</u>

"'It is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).'" <u>Id.</u> (quoting <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992)).

The first question in an infringement suit relating to an unregistered mark is whether the mark is protectable. <u>Genesee Brewing Co., Inc. v. Stroh Brewing Co.</u>, 124 F.3d 137, 148–51 (finding that the unregistered mark "Honey Brown" is not protectable and affirming the district court's dismissal without reaching the question of likelihood of confusion); <u>see also</u> <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d 384, 390 (2d Cir. 1995); <u>Bristol-Myers</u>, 973 F.2d at 1039. The more distinctive a mark is, the more likely it is entitled to trademark protection. Thus, to determine whether a mark is protectable, a court will place it in one of four categories on a spectrum of distinctiveness, which arranged from least to most distinctive are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. <u>Id.</u> at 1039; <u>Abercrombie & Fitch Co. v. Hunting World</u>, 537 F.2d 4, 9 (2d Cir. 1976).

Generic marks are common descriptions of goods—that is, terms that refer to the genus of which the product is a species—and as such, they are not protectable. <u>Park 'N Fly, Inc. v. Dollar Park & Fly</u>, 469 U.S. 189, 194 (1985).

Descriptive marks describe product features, qualities or ingredients in ordinary language, and are entitled to protection only if they have acquired "secondary meaning."  W.W.W. Pharma. Co. v. Gillette Co., 984 F.2d 567, 572 (2d Cir. 1993); see also Two-Pesos, 505 U.S. at 769.  To show secondary meaning, a proponent of a mark must demonstrate that in addition to the ordinary or common meaning of the words used, the consuming public generally associates the words with a single producer.  Bristol-Myers, 973 F.2d at 1040; Thompson Med. Co. v. Pfizer, Inc., 753 F.2d 208, 215-16 (2d Cir. 1985).

Suggestive marks and arbitrary or fanciful marks are inherently distinctive and are entitled to protection.  Id. at 213.  Suggestive marks employ terms that do not describe but merely "suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of the goods."  W.W.W. Pharma., 984 F.2d at 572 (internal quotation mark omitted).  Fanciful terms are those created solely for their use as trademarks, and when a common word is applied in a trademark in an unfamiliar way, it is deemed "arbitrary."  See Genesee Brewing, 124 F.3d at 143; Abercrombie, 537 F.2d at 11 n.12.  "[T]he line between descriptive and suggestive may be difficult to discern."  Bristol-Myers, 973 F.2d at 1040; see also Abercrombie, 537 F.2d at 9 ("The lines of demarcation" between the "four categories of terms with respect to trademark protection" are "not always bright.").

2.     Secondary meaning

"The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation."  PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 564 (2d Cir. 1990).  While a producer may strive to create secondary meaning in a mark, it is the consuming public that ultimately determines whether those efforts have succeeded.  Bristol-Myers, 973 F.2d at 1042 (citing Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1221 (2d Cir. 1987)).[5]  A determination of secondary meaning may be based on the following:

1.  Advertising expenditures;

2.  Consumer studies linking the mark to a source;

3.  Unsolicited media coverage of the product;

4.  Sales success;

5.  Attempts to plagiarize the mark; and

6.  Length of exclusivity of the mark's use.

Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc., 65 F.3d 1063, 1071 (2d Cir. 1995) (citing Centaur Commc'ns, 830 F.2d at 1222).

---

[5] To determine whether a trademark is generic, courts apply the "primary significance" test to the question of how a consumer perceives a particular product.  Genessee Brewing, 124 F.3d at 144.  That rule has been codified at 15 U.S.C. § 1064(3) ("The primary significance of the relevant mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.")

IV.    DISCUSSION

A.    <u>The Reports and Opinions of Defendant's Two Experts Are Precluded.</u>

On this motion for summary judgment, the Court may only consider admissible evidence.  <u>Raskin</u>, 125 F.3d at 66.  For the reasons set forth below, the reports and opinions of CI's two proposed experts, Michael Rappeport and James Berger, do not meet the basic requirements of <u>Daubert</u> and Federal Rule of Evidence 702.  The Court therefore precludes their reports and opinions and does not consider them in connection with the resolution of this motion.

1.    <u>Michael Rappeport</u>[6]

Cross Commerce has moved to preclude CI's proposed expert Michael Rappeport.  (ECF No. 106.)  Rappeport has proffered a report describing his review of a single marketing document (which he refers to as a "Tracking Study") apparently commissioned by CI in 2013, in connection with internal work wholly separate from this litigation.  Rappeport uses this document—which apparently consists of two questions—as the basis for his opinion that CI has obtained secondary meaning in the word "collective."  He acknowledges that the document was created in 2013 and therefore does not opine on whether it can or attempts to

---

[6] Several courts have either precluded Rapperport or found his opinions deficient in significant ways. <u>See, e.g.</u>, <u>Bracco Diagnostics, Inc. v. Amersham Health, Inc.</u>, 627 F. Supp. 2d 384, 446–48 (D.N.J. 2009) ("Dr. Rappeport's survey is replete with problems that undermine the survey's reliability."); <u>Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.</u>, 511 F. Supp. 2d 482, 500 (E.D. Pa. 2007) (noting several deficiencies in Rappeport's testimony and concluding that it was of "limited weight" in determining whether there was true confusion between two marks); <u>J & J Snack Foods Corp. v. Earthgrains Co.</u>, 220 F. Supp. 2d 358, 366-72 (D.N.J. 2002) ("In this case, the Rappeport survey suffers from two substantial flaws that show that it is not trustworthy and is not admissible."); <u>Cumberland Packing Corp. v. Monsanto Co.</u>, 32 F. Supp. 2d 561, 571 (E.D.N.Y. 1999) ("Reviewing Dr. Rappeport's reports, his testimony at depositions, and the survey methodologies he used . . . the court finds the studies flawed and the survey results untrustworthy and unreliable.").

convey any information regarding whether the term "collective" did or did not have secondary meaning in 2011.

Rappeport's opinion is fundamentally flawed and his opinions based thereon are unreliable.  It would be a dereliction of this Court's role as a "gatekeeper" to find such an opinion admissible.  See United States v. Williams, 506 F.3d 151, 160 (the district court is the ultimate "gatekeeper" responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting Daubert, 509 U.S. at 597) (other citations omitted)).

At the outset of his report, Rappeport explains that he did not perform a consumer survey because doing so is "difficult, extremely time consuming and necessarily requires a significant amount of resources."  (Survey Data Analyzed and Discussed in the Case Cross Commerce Media, Inc. v. Collective, Inc., ECF No. 137 ex. 1 at 1 ("RL Report").)  This makes little sense in light of the significant resources the parties have spent litigating this case, but be that as it may, CI made a tactical decision to proceed in this manner.

Rappeport's report has two parts: (1) his recitation and reiteration of what is apparent on the face of the marketing document, dated 2013, commissioned by CI from "Advertising Perceptions"; and (2) his opinions regarding secondary meaning of the word "collective," which are based on that document.  There are numerous methodological and legal issues with Rappeport's report.

As an initial legal matter, as Rappeport is merely reciting what is on the face of a document produced during discovery, he is doing no more than that which the

finder of fact could him or herself do, and thus his report may be precluded on this basis alone.  Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 ("For an expert's testimony to be admissible  . . . it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help.").  Rappeport is not, in fact, applying any of his supposed expertise to the document; instead, he is apparently using his credentials to try to convert a consumer study that does not adequately addresses secondary meaning into one that does.  His attempt to do so reduces to no more than excludable ipse dixit.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The methodology used in the study summarized in the marketing document was not designed by or for Rappeport, though he states he has satisfied himself as to its methodology.  Rappeport's personal satisfaction, however, is simply not enough.  Rather, Daubert requires an expert to set forth his methodology in a detailed manner, such that a court can assess its validity and applicability to the facts at issue.  509 U.S. at 592-93.  The sum total of the methodological basis for Rappeport's assessment of the study is contained within his description stating that the respondents were marketers and advertising agencies who were involved in online, mobile, tablet, or TV media brand selection decisions for firms placing at least one million dollars of advertising in the previous 12 months (RL Report at 2), the language of which is taken from the marketing document itself (see id. app. A at 3).  Rappeport also refers to the company that performed the study, but fails to

provide any information regarding whether this company is qualified to perform a study that is sufficiently reliable to be used in this litigation for the purpose for which he has offered it.  Thus, while Rappeport may be "comfortable" with the study, this Court is not.

More particularly, the use of the marketing document as evidence of secondary meaning as to the word "collective" is problematic for six distinct reasons.  First, the document does not reflect that the respondents were asked questions relevant to the issue of secondary meaning.  See, e.g., Pfizer Inc. v. Astra Pharm. Prods., Inc., 858 F. Supp. 1305, 1321-22 (S.D.N.Y. 1994) (rejecting survey evidence because questions were not probative of secondary meaning).  The document sets forth two sets of questions and answers: one asks for familiarity with a variety of companies, including "Collective," and the second asks about familiarity with "phrases" or "taglines" which may be associated with CI.  Neither effectively asks whether respondents associate the word "collective" with CI, or whether respondents associate the particular goods and services of one company with the name "collective" and who that company is.

Second, the marketing document fails to address the appropriate timeframe at issue with regard to secondary meaning.  See, e.g., Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 689 (S.D.N.Y. 1963) (survey conducted in 1960 not probative of secondary meaning in 1957, the year the parties first began to compete); Calvin Klein Co. v. Farah Mfg. Co., Inc., No. 85 Civ. 2989 (CBM), 1985 WL 3953, at *9 (S.D.N.Y. Nov. 26, 1985) (survey was "fatally defective" because it

did not indicate secondary meaning "for the relevant time period").[7]  CI must proffer evidence of secondary meaning in the term "collective" as of 2011, yet the marketing document is dated 2013.  There are no questions in the document seeking to determine if, for instance, respondents' answers would have been the same in 2011 or whether they had a similar awareness in 2011.  Thus, whatever this marketing document may convey, it is of the state of play in 2013, not in 2011.

Third, a properly conducted consumer survey asks questions of a group of consumers of the relevant products or services.  See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 652 F. Supp. 1105, 1110 (S.D.N.Y. 1987) (the trustworthiness of a survey used to appraise the existence of secondary meaning depends upon a demonstration by its proponent that "the universe was properly defined" and "a representative sample of that universe was selected" (quotation omitted)), aff'd, 830 F.2d 1217 (2d Cir. 1987); see also McCarthy on Trademarks and Unfair Competition, supra, § 32:159 ("Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant. Once the 'universe' is selected, a sample to be surveyed is selected from that universe.").  On its face, the marketing document states that respondents were limited to those who had control over an advertising spend of at least one million dollars in the past twelve months.  Rappeport asserts that this is the correct group, but provides no rationale as to why.  Again, the Court is left only with his ipse dixit.

---

[7] It is of course possible to ask survey participants whether they associated a word or phrase with a particular company at some point in the past.  CI did not, however, construct its survey in this manner.

Fourth, on its face, the marketing study asks respondents if they recognize the company "Collective," along with a number of other companies (and notably, only 24% are "very familiar" with "Collective"). But this question sheds no light on whether respondents more generally associate the word "collective" with CI's specific services and products versus those offered by other companies.

Fifth, the second question concerns the association of various taglines with CI (for example, "The Audience Engine"). However, this question did not test the word "collective," or any association with the products and services of CI with the word "collective," at all.

Sixth, Rappeport's review of this marketing document and his conclusions based thereon simply do not provide support for secondary meaning. In his ultimate opinion section, Rappeport refers to the "appropriate audience" as "think[ing] it realistic to refer to 'Collective' as the name of a company." (RL Report at 6). He also refers to "20%" of the "appropriate audience" exhibiting a "high level of familiarity with <u>a</u> company called 'Collective.'" (<u>Id.</u> (emphasis added).) These statements in fact demonstrate a low recognition of any type of use of the word "collective" and are facially non-specific as to CI and its products and services themselves. Based on these opinions, Rappeport further opines that the word "collective" has achieved secondary meaning among "people involved in . . . brand selection decisions for a firm placing at least one million dollars of advertising in the previous 12 months." This statement is utterly without foundation.

CI nevertheless argues that Rappeport's report is "highly probative." (ECF No. 136 at 1.) This Court fails to see why this is so. To be probative, the report would need to have some reasonable basis, which it does not. It would also have to answer a question about secondary meaning, which because of the flaws in its methodology, it cannot.

This marketing document—whatever its original purpose—does not remotely do that which a consumer survey testing secondary meaning as of 2011 would need to. The opinions Rappeport has based on this marketing document are therefore without value in this litigation. In an exercise of this Court's most basic gatekeeping function, both he and they are precluded.[8] The Court therefore need not consider Rappeport's opinions in deciding Cross Commerce's motion for summary judgment.

    2.   <u>James Berger</u>

Having failed to present any evidence in response to Cross Commerce's prior motion for summary judgment that the term "collective" is descriptive (March 24, 2014 Opinion at 11), CI has now offered a report from James Berger. Berger's report comes many months too late. Having lost the motion regarding the mark's descriptive character, CI cannot now attempt to relitigate that issue. Courts and

---

[8] In a declaration submitted in opposition to Cross Commerce's motion to preclude him, Rappeport attempts to defend his opinions. (ECF No. 137.) His defenses do not even begin to address the many deficiencies of his expert report. For instance, he argues that he found support for the study's reliability in the fact that CI spent a "significant amount of money" on it and thus wanted accurate results; this is (1) without foundation in fact, and (2) not necessarily correlative with quality of output. He also defends the use of the "slogan" question as a "built-in control," but provides a confused reference to avoiding guesswork by asking respondents to identify a source. This, of course, may work for some other type of survey, but makes little sense in the context of a survey concerning the word "collective." And as this Court has already stated, the "slogan question" simply cannot answer the factual question regarding secondary meaning of the word "collective."

litigants share an important interest in finality.  Virgin Atl. Airways, Ltd. v. Nat'l
Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) ("[W]here litigants have once
battled for the court's decision, they should neither be required, nor without good
reason permitted, to battle for it again.").  This important interest would be
disserved if this Court were to allow CI to try one strategy and, after it has failed,
allow CI to relitigate the very same question by trying a different strategy.  The
Berger report is therefore precluded on the basis that it addresses an issue already
resolved: the character of the word "collective."

The Berger report is also in any event fundamentally flawed, and it is
therefore precluded as failing under the basic requirements of Daubert.  Berger
proffers conclusions that the term "collective" is suggestive or arbitrary or fanciful
when his own survey results plainly fail to support such a conclusion.  His opinion is
therefore without basis and must be precluded.[9]

B.    The Word "Collective" is Not Protectable.

The key merits question in this litigation is whether CI has a protectable
mark in the single word "collective."  In the absence of a protectable mark, the
Court need not reach the question of whether another's use of that word could cause
a likelihood of consumer confusion.  See Christian Louboutin S.A. v. Yves Saint
Laurent Am. Holdings, Inc., 696 F.3d 206, 216-17 (2d Cir. 2012).

---

[9] Berger's survey asked respondents to categorize the word "collective" under one of the four
trademark categories of "generic, descriptive, suggestive or arbitrary or fanciful."  The most common
answer to this question was that the word was "generic". (Report of James T. Berger, ECF No. 131
ex. 1 at 9 ("Berger Report").)  The majority of respondents (55%) answered that the word was either
generic or descriptive.  (Id.)  Only 29% responded that the term was suggestive or arbitrary/fanciful.
(Id.)  Thus, there is no basis to take the lowest result and state an opinion as if that result were the
highest.

This Court has already found that the word "collective" is descriptive. (March 24, 2014 Opinion at 10-11.)[10]   In the absence of secondary meaning, descriptive marks are not entitled to protection.  See Papercutter, 900 F.2d at 562 ("As to descriptive terms, a person cannot, by mere adoption and use, obtain exclusive rights in words that describe the attributes of goods, services, or business, to which the words are applied." (internal quotation marks and alteration omitted)). Secondary meaning of the word "collective" would need to demonstrate that the consuming public associates that word with CI's products or services, rather than another source.  See Bristol-Myers, 973 F.2d at 1041; Papercutter, 900 F.2d at 564.

In support of this motion, Cross Commerce has asserted that CI cannot and has not shown secondary meaning.  In response, CI bore a burden of production:  it had to raise a triable issue of fact as to that issue.  See Mana, 65 F.3d at 1071 (affirming district court's grant of summary judgment where plaintiff failed to raise a triable issue as to whether its product had acquired secondary meaning); Bernard v. Commerce Drug Co., 964 F.2d 1338, 1343 (2d Cir. 1992) (same).  It has failed to do so.

---

[10] The Court's determination in this regard was made in connection with an earlier motion by Cross Commerce.  As set forth in the Court's opinion on that motion, CI failed to offer or proffer any proof whatsoever that its use of the word "collective" was anything other than descriptive.  For instance, it could have (but did not) submit a declaration from an individual with knowledge of CI's use of the word, or it could have proffered advertisements that supported an inference of a suggestive use of the word, but it did neither. CI made a vague, general assertion that it would later submit some sort of survey—but it failed to suggest what questions that survey would seek to answer (and, indeed, it ultimately decided not to proceed with its own survey).  Accordingly, this Court's determination that CI's use of the word "collective" is descriptive is law of the case—and CI may not reargue that determination in connection with this separate motion.  See Virgin, 956 F.2d at 1255 (explaining law of the case doctrine).

      1.    <u>Defendant failed to provide a useful consumer survey.</u>

The most common type of proof of secondary meaning is a consumer survey. <u>See, e.g.</u>, <u>Mana</u>, 65 F.3d at 1071 (affirming a grant of summary judgment when a plaintiff failed to submit a consumer study and failed to raise a triable issue of fact as to secondary meaning); <u>815 Tonawanda St. Corp. v. Fay's Drug Co., Inc.</u>, 842 F.2d 643, 648 (2d Cir. 1988) (plaintiff's failure to conduct consumer surveys a primary reason district court correctly concluded plaintiff failed to meet their burden of proving secondary meaning); <u>20th Century Wear, Inc. v. Sanmark-Stardust, Inc.</u>, 815 F.2d 8, 10 (2d Cir. 1987) ("consumer studies" can help party to meet "heavy burden" of proving secondary meaning).  Here, for unknown reasons, CI chose not to offer such a survey.  Instead, it has proffered a marketing document and attempted to proffer an opinion based on this document from a purported expert in the field.  However, that purported expert has been precluded, as discussed above, and in any event, the document is simply inadequate to raise a triable issue as to secondary meaning.  Furthermore, as set forth above, that document does not ask the same type of questions as, and cannot have the same utility as a consumer study.  Presumably, experienced trademark counsel understood this risk when it chose not to submit its own study.

      2.    <u>The evidence relating to advertising and sales is unconvincing.</u>

CI could have proffered documents demonstrating time, attention and money spent building the recognition and association of the word "collective" with its products and services.  It has not done so.  Instead, it has proffered evidence that

money was spent in general advertising efforts, which does little to establish secondary meaning.  (Hoskins Decl. ¶¶ 6, 10-11.)

        3.    <u>Defendant is not the senior user of the mark.</u>

Even if CI could make a sufficient showing of secondary meaning to defeat summary judgment, Cross Commerce would nonetheless be entitled to summary judgment because it is the senior user of the mark.

There is no dispute that CI never trademarked the single word "collective," and the use of a composite mark does not reserve rights to the individual words comprising it.  <u>See</u> <u>In re Nat'l Data Corp.</u>, 753 F.2d 1056, 1059 (Fed. Cir. 1985) ("The registration affords <u>prima facie</u> rights in the mark <u>as a whole</u>, not in any component." (emphasis in original)); <u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 786 F. Supp. 182, 194 (E.D.N.Y. 1992), <u>aff'd in relevant part</u>, 973 F.2d 1033 (2d Cir. 1992); <u>Brandwynne v. Combe Int'l, Ltd.</u>, 74 F. Supp. 2d 364, 382 n.13 (S.D.N.Y. 1999) ("Even if plaintiffs could establish secondary meaning in the composite mark 'intimate moisture', they may not rely upon that secondary meaning to establish secondary meaning in 'intimate' which is only one component of that mark."); <u>see also</u> <u>Igloo Prods. Corp. v. Brantex, Inc.</u>, 202 F.3d 814, 817 (5th Cir. 2000); <u>Spraying Sys. Co. v. Delavan, Inc.</u>, 975 F.2d 387, 393 (7th Cir. 1992).  Thus, CI's existing trademarks do not encompass its separate claim for rights to the single word "collective."

In order to exclude Cross Commerce from its own, independent use of the word "collective," CI must raise a triable issue as to whether it is the senior user of

the mark.  If CI is not the senior user, it cannot exclude another from use.  See ITC v. Punchgini, Inc., 482 F.3d 135, 147 (2d Cir. 2007).

Here, CI has proffered a variety of evidence it claims supports its position as senior user.  However, none of the evidence in fact supports that point.

As an initial matter, the Court asks whether CI has used the word "collective" as a standalone mark in commerce.  The statute defines "use in commerce" as the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  To be deemed "used in commerce," a mark must be used or displayed "in the sale or advertising of services."  Id.

The bulk of the evidence that CI has submitted in support of its use of the word "collective" are of three types.  First, CI points to the use of the word as part of an Internet domain name.  But the use of a phrase in a domain name does not necessarily mean that it is being used as a mark in commerce.  See TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc., 244 F.3d 88, 104 (2d Cir. 2001) (analyzing whether defendant's use of phrase in a domain name was "as a mark").  Even if CI used "collective" in its domain name and email addresses, it must bring forth additional evidence that it used the mark in its marketing materials.  As previously explained, it has failed to do so.

Second, CI proffers a number of references to it in the text of news articles or PowerPoint presentations.  Such uses are not "in commerce" as defined by the

statute, because they do not use or display the word "collective" in connection with any sale or advertising of CI's services.  See 15 U.S.C. § 1127.

Third, CI refers to the use of the word "collective" as it appears as part of the composite mark, "C Collective The Audience Engine."  But as previously stated, the use of a composite mark does not reserve rights to the individual words comprising it.  See, e.g., In re Nat'l Data Corp., 753 F.2d at 1059; Bristol-Myers, 786 F. Supp. at 194; Brandwynne, 74 F. Supp. 2d at 382 n.13.

CI has therefore failed to demonstrate that it ever once used the word "collective" as a standalone mark in commerce before 2011.  In contrast, the evidence is clear that Cross Commerce began using the mark Collective Intelligence in January 2011 and Collective[i] in September 2011.

4.    Third-party usage data undercuts defendant's claim of exclusivity.

Additional evidence, if any is needed, that CI cannot claim exclusive rights in the word "collective" is found in third party usage data.  As of November 2013, the PTO database had 534 registrations or applications for marks using the word "collective"; the word "collective" is used in the name of over 7,000 businesses in 45 states; over 500 entities in New York and over 3,000 in California use the word "collective" in their name; there are over 25,000 registered Internet domain names that contain the word "collective"; and there are more than a dozen companies in the digital advertising and marketing field that use the word "collective" in connection with their name or goods and services.  (March 24, 2014 Opinion at 4.)

The law is clear that third party usage weighs against a finding of exclusivity.  See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998); Gameologist Grp., LLC v. Scientific Games Int'l, Inc., 838 F. Supp. 2d 141, 159-60 (S.D.N.Y. 2011) (no exclusivity in the word "bling" when a search for the word revealed more than 160 hits); Air Cargo News, Inc. v. Tabmag Publ'g, Ltd., No. 07-CV-480 (DLI)(RLM), 2007 WL 1101183, at *10 (E.D.N.Y. Apr. 11, 2007) ("[G]iven the number of publications using the word 'air cargo' in their titles that circulate in the United States, plaintiff's use of the phrase cannot be characterized as exclusive.").

In sum, CI has not shown that it has or could have any exclusive rights in the word collective.  CI lacks common law trademark rights and is not the senior user of the mark.  Cross Commerce is therefore fully entitled to use the word "Collective[i]" as it has.

V.     CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment as to defendant's claim for trademark infringement and its claim for declaratory judgment is GRANTED.  Accordingly, judgment is entered for plaintiff with respect to its First Cause of Action and with respect to Counts One and Two of defendant's counterclaims.  The parties shall file any motions with regard to the remaining counts (plaintiff's Second Cause of Action and Count Three of the counterclaims) not later than September 19, 2014.  The Court also GRANTS plaintiff's motions to

preclude expert testimony by Michael Rappeport and Thomas T. Berger, and

DENIES plaintiff's July 11, 2014 motion <u>in limine</u> as moot.

The Clerk of Court is directed to close the motions at ECF Nos. 102, 106, 113,

168.

SO ORDERED.

Dated:      New York, New York
            August 21, 2014


_____
            KATHERINE B. FORREST
            United States District Judge


31